967 F.2d 1356
 30 Wage & Hour Cas. (BNA) 1569, 61 USLW 2063,
122 Lab.Cas. P 35,664, 23 Fed.R.Serv.3d 159,
1 Wage & Hour Cas.2d (BNA) 536
 Felton HALE and Richard S. Berry, Plaintiffs-Appellants,
v.
STATE OF ARIZONA; ARCOR Enterprises, a subdivision of the
state; James Ricketts, former director of the Arizona
Department of Corrections; Samuel Lewis, director of the
DOC; Mariln Wilkens, director of Arizona Correctional
Industries; Thomas Lescault, director of ARCOR; David
Tierney, Earl Cobb, Thomas Donnelly, Henry Evans, Marcus
Englemen, Delbert Householder, and Ray Shaffer, members of
the Board of Directors, ARCOR Enterprises, Defendants-Appellees.
John Leroy FULLER, et al., Plaintiffs-Appellants,
v.
STATE OF ARIZONA; ARCOR Enterprises, a subdivision of the
state; James Ricketts, former director of the Arizona
Department of Corrections; Samuel Lewis, director of the
DOC; Mariln Wilkens, director of Arizona Correctional
Industries; Thomas Lescault, director of ARCOR; Tony West,
David Tierney, Earl Cobb, Thomas Donnelly, Henry Evans,
Marcus Englemen, Delbert Householder, and Ray Shaffer,
members of the Board of Directors, ARCOR Enterprises;
Richard Orberg, ARCOR Vice President of Operations; Kenneth
Van De Veer, ARCOR Vice President of Business and Finance;
John F. Wright, former interim CEO, ARCOR; James Kinsella,
former ARCOR Vice President of Business and Finance;
Gilbert Evans, former ARCOR director of operations; Ralph
Cluff, ARCOR operations and control officer; Michael
Ullery, former interim ARCOR operations and control officer,
Defendants-Appellees.
 Nos. 88-15785, 89-15162.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 14, 1990.
Submission Withdrawn March 14, 1990.
Resubmitted April 20, 1992.
Decided June 24, 1992.
Order Granting Rehearing En Banc
Sept. 16, 1992.
 
 Michael E. St. George, St. George & Reed, Tempe, Ariz., for plaintiffs-appellants.
 June Ava Florescue, Asst. Atty. Gen., Phoenix, Ariz., for defendants-appellees.
 Appeals from the United States District Court for the District of Arizona.
 Before: FLETCHER, PREGERSON, and D.W. NELSON, Circuit Judges.
 D.W. NELSON, Circuit Judge:
 
 
 1
 Appellants in both Hale and Fuller are inmates in an Arizona penitentiary who work for Arizona Correctional Industries (hereinafter "ARCOR"), making products for sale in the outside world. They brought these actions against Arizona, ARCOR and prison officials, claiming that under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq. (1989), they were entitled to be paid the federal minimum wage for their work. Appellants in both cases also sought relief under Ariz.Rev.Stat. § 31-254 and under 42 U.S.C. § 1983. The district court in Fuller dismissed appellants' suit, and the district court in Hale granted summary judgment for the defendants. We conclude that the inmates are entitled to receive a minimum wage for their work. Accordingly, we affirm in part, reverse in part, and remand both cases.
 
 I. FACTUAL AND PROCEDURAL BACKGROUND
 
 2
 Inmates within the Arizona prison system have a statutory obligation to "engage in hard labor for not less than forty hours per week." Ariz.Rev.Stat. 31-251. About ten percent of the inmates satisfy this obligation by working for the ARCOR correctional industries program (known as ACI since 1987), which makes a variety of products for sale or use outside the prison. ARCOR consists of several divisions or "enterprises" which are all owned and run by ARCOR but which produce different products. An ARCOR enterprise is "deemed a private enterprise and subject to all the laws and lawfully adopted rules of this state governing the operation of similar business enterprises elsewhere." Ariz.Rev.Stat. § 41-1623(D)(3).
 
 
 3
 We have consolidated two separate appeals from inmates in the ARCOR program: Fuller and Hale. The claims of 296 similarly-situated plaintiffs are consolidated in Fuller. All of those plaintiffs have appealed to this court. The appellants in Fuller work for a number of ARCOR enterprises and produce a wide variety of goods, from hogs for Farmer John meats to license plates. In order to work for the ARCOR program, appellants must apply to and be accepted by the prospective department or division and pass an institutional security review. All revenue from ARCOR enterprises is placed in a revolving fund, out of which ARCOR pays wages and expenses.
 
 
 4
 Berry, the only plaintiff in Hale who has appealed to this court, worked as a clerk and office manager for a business operated within a division of ARCOR.[1] The business was part of the ARCOR Inmate-Operated Business Enterprise ("IOBE") program. As the name suggests, selected inmates in the IOBE program organize and operate their own businesses under ARCOR's supervision. Workers are selected by the inmate-owner and then apply to the Department of Corrections ("DOC") for the right to work. The profits from the businesses belong to the inmate owners, and the businesses can be sold. The businesses market their goods to the private sector. The DOC monitors the businesses and exacts a portion of the profits along with a monthly rent. Inmate wages are paid to the DOC, which in turn pays the inmates by depositing the funds into their commissary accounts. Inmates are paid 50 cents an hour for their work.
 
 
 5
 The plaintiffs in both cases sued for minimum wages under Arizona law, the FLSA, and 42 U.S.C. § 1983. The district court in Fuller dismissed the FLSA claim because it found that it had no jurisdiction over the state on any claims for monetary relief under either state or federal law. The court retained jurisdiction, however, over the plaintiffs' claims for prospective relief against the state under section 1983.[2] The district court in Hale granted the defendants' motion for summary judgment. It found no employer/employee relationship under the FLSA and no jurisdiction over state claims or retrospective federal claims because of the 11th Amendment. There was no request in Hale for prospective relief. The plaintiffs in both cases appealed, and we have consolidated the cases for purposes of this appeal.
 
 II. STANDARD OF REVIEW
 
 6
 A grant of summary judgment is reviewed de novo. Kruso v. International Telephone & Telegraph Corp., 872 F.2d 1416, 1421 (9th Cir.1989), cert. denied, 496 U.S. 937, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990). The appellate court must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. Tzung v. State Farm Fire and Casualty co., 873 F.2d 1338, 1339-40 (9th Cir.1989). Whether an employer-employee relationship existed under the FLSA is a question of law. Bonnette v. California Health and Welfare Agency, 704 F.2d 1465, 1469 (9th Cir.1983).
 
 
 7
 A dismissal under Fed.R.Civ.P. 12(b)(6) is reviewed de novo. Kruso, 872 F.2d at 1421. In reviewing a motion to dismiss, plaintiffs' factual allegations are taken as true and construed in the light most favorable to the plaintiffs. Love v. United States, 915 F.2d 1242, 1245 (9th Cir.1989).
 
 III. NOTICE OF APPEAL
 
 8
 Fed.R.App.P. 3(c) provides that "[t]he notice of appeal shall specify the party or parties taking the appeal ..." This requirement is jurisdictional and may not be waived. Torres v. Oakland Scavenger Co., 487 U.S. 312, 317, 108 S.Ct. 2405, 2409, 101 L.Ed.2d 285 (1988). Arizona contends that the notice of appeal in Fuller was defective because the caption did not list all 296 parties whose actions were consolidated below and that the notice in Hale was defective because not all the defendants below were listed in the caption. We find that both notices meet the requirements of Rule 3.
 
 A. Fuller
 
 9
 On December 1, 1988, the district court filed a supplemental order consolidating 296 cases into Fuller. The caption of the notice of appeal in Fuller simply lists "JOHN LEROY FULLER Plaintiffs." However, the body of the notice reads: "Come now plaintiff consolidated in the captioned cause do hereby appeal." In Gilbreath v. Cutter Biological, Inc., 931 F.2d 1320, 1323 (9th Cir.1991), we construed language identical to that used in Fuller's notice of appeal to mean that all the consolidated plaintiffs were appealing:
 
 
 10
 [A]ppellants in this case accurately listed the parties to the appeal by describing them as all plaintiffs consolidated below. There was no need for appellants to list each party individually, since appellees could have [dis]covered their identities by referring to records of the lower court proceedings. The policy behind Rule 3(c) thus was adequately served.
 
 
 11
 Gilbreath is dispositive here.
 
 B. Hale
 
 12
 The notice of appeal in Hale names as defendants in the caption "STATE OF ARIZONA; ARCOR ENTERPRISES, a subdivision of the state; ARIZONA CORRECTIONAL INDUSTRIES, a subdivision of the state et al." The body of the notice states that the "plaintiffs Berry and Berry ... notice their appeal to the Ninth Circuit Court of Appeals of the judgment of December 8, 1988 dismissing their complaints. This appeal is taken as to all issues concluded with the judgment of the court." Neither in the caption nor the body of the notice did appellants list the individual defendants they had sued in the district court. However, Rule 3(c) does not require that appellees be listed, only appellants. Since only Berry is appealing, Rule 3 is satisfied.[3]
 
 
 13
 Appellants in both cases filed adequate notices of appeal.
 
 IV. FAIR LABOR STANDARDS ACT
 
 14
 The FLSA governs the relationship between employers and employees. It requires employers to pay their employees a minimum wage of $4.25 per hour. 29 U.S.C. § 206(a)(1). The defendants contend that the FLSA does not apply to them for two reasons. First, they assert that the FLSA cannot apply to state governments under the Eleventh Amendment. Second, they claim that the inmates were not employees of the state within the meaning of the Act. We address each argument in turn.
 
 A. Applicability of the FLSA to States
 
 15
 Arizona claims that the Eleventh Amendment bars any claim against it under the FLSA. However, Congress has the power to override a state's Eleventh Amendment immunity in the exercise of its Commerce Clause power. Pennsylvania v. Union Gas, 491 U.S. 1, 14-15, 109 S.Ct. 2273, 2281, 105 L.Ed.2d 1 (1989) (plurality opinion); see id. at 57, 109 S.Ct. at 2303 (White, J., concurring in the judgment). The question we face, therefore, is whether Congress intended to do so when it enacted the FLSA.
 
 
 16
 Congress overrides Eleventh Amendment immunity only when its intent to do so appears in "unmistakable language in the statute itself." Atascadero State Hospital v. Scanlon, 473 U.S. 234, 243, 105 S.Ct. 3142, 3148, 87 L.Ed.2d 171 (1985). Congress has done so in this case. In 1985, the Supreme Court held that states were not immune from federal regulation of their "traditional state functions." Garcia v. San Antonio Metro. Transit Auth., 469 U.S. 528, 546-47, 105 S.Ct. 1005, 1015, 83 L.Ed.2d 1016 (1985). In so doing, the Court overruled National League of Cities v. Usery, 426 U.S. 833, 852, 96 S.Ct. 2465, 2474, 49 L.Ed.2d 245 (1976), which had held the contrary. Shortly after the decision in Garcia, Congress amended the FLSA, giving states until April 15, 1986 to conform to the Act. 99 Stat. 787 § 2(c)(1) (1985). In the wake of this amendment, as we held in Gilbreath, "it is clear that the FLSA's protection now extends to state employees." 931 F.2d at 1324. If the inmates are state employees, therefore, they are protected by the FLSA.
 
 
 17
 B. Employer/Employee Relationship Under the FLSA
 
 
 18
 Appellants contend that they are in an employment relationship with the DOC and ARCOR as such a relationship is defined under the FLSA, and therefore that they are covered by the minimum wage requirements of that statute. The defendants advance two reasons why the FLSA does not apply in these cases. First, they claim that the FLSA does not apply to inmate employees at all. Second, the defendants argue that even if inmates can be employees under the FLSA, no employer-employee relationship existed with these particular inmates.
 
 1. Application of the FLSA to Prisoners
 
 19
 Appellees contend that the plaintiffs cannot be employees because the FLSA was not intended to cover prisoners. Appellees argue that the purpose of the FLSA was to maintain the "minimum standard of living necessary for health, efficiency and general well-being of workers." 29 U.S.C. § 202(a). Because the inmates are cared for by the state, and because the inmates' work is a function of their incarceration and custody, appellees contend, the FLSA does not apply to them. Whether the FLSA applies to prisoners is an open question in this circuit.[4] Based on the purpose and structure of the FLSA and the decisions interpreting it and analogous statutes, we conclude that Congress intended to regulate prison labor.
 
 
 20
 We begin with the well-settled principle that when interpreting the FLSA courts are required to define "employer" and "employee" expansively and to construe exemptions narrowly. See, e.g., Tony & Susan Alamo Found. v. Secretary of Labor, 471 U.S. 290, 295-96, 105 S.Ct. 1953, 1958-59, 85 L.Ed.2d 278 (1985); Goldberg v. Whitaker House Cooperative, Inc., 366 U.S. 28, 32, 81 S.Ct. 933, 936, 6 L.Ed.2d 100 (1961); Rutherford Food Corp. v. McComb, 331 U.S. 722, 730, 67 S.Ct. 1473, 1477, 91 L.Ed. 1772 (1947); Real v. Driscoll Strawberry Associates, Inc., 603 F.2d 748, 754 (9th Cir.1979). Indeed, given the "striking breadth" of the FLSA's definition of "employee," the Supreme Court has determined that that term reaches some parties who may not traditionally be thought of as employees at all. Nationwide Mutual Ins. Co. v. Darden, --- U.S. ----, ----, 112 S.Ct. 1344, 1349, 117 L.Ed.2d 581 (1992).
 
 
 21
 Next, we consider the structure of the FLSA. We conclude that the way the Act was written suggests that Congress intended to include prisoners within the scope of the Act. In 29 U.S.C. § 213 (1982), Congress set forth an extensive list of workers who are exempted from the Act. The Supreme Court has consistently refused to exempt from coverage employees not mentioned in section 213, reasoning that "[s]uch specificity in stating exemptions strengthens the implication that employees not thus exempted ... remain within the Act." Powell v. United States Cartridge Co., 339 U.S. 497, 517, 70 S.Ct. 755, 766, 94 L.Ed. 1017 (1950). Significantly, Congress did not exempt prisoners from the Act in section 213. The framework of the FLSA--a broad general definition of "employees" followed by several specific exceptions--"strongly suggests that Congress intended an all-encompassing definition of the term 'employee' to include all workers not specifically excepted." Patel v. Quality In South, 846 F.2d 700, 702 (11th Cir.1988), cert. denied, 489 U.S. 1011, 109 S.Ct. 1120, 103 L.Ed.2d 182 (1989).
 
 
 22
 Congress has modified section 213 on numerous occasions, but has never added prisoners to the list of those exempted. Under these circumstances, "it would be an encroachment upon the legislative prerogative for a court to hold that a class of unlisted workers is excluded from the Act." Carter v. Dutchess Community College, 735 F.2d 8, 13 (2nd Cir.1984).
 
 
 23
 Construing the FLSA to include inmate workers is also consistent with the purposes of the Act. Although providing a minimum standard of living is certainly one purpose of the Act, another equally important purpose was to eliminate unfair competition between employers and between workers seeking employment. 29 U.S.C. § 202(a)(3). Congress intended to protect both private businesses and employees from being driven out of work by competing products made with cheap labor. Congress' recognition of the unfair competition that results from using low-paid prison labor is apparent in 18 U.S.C. § 1761. In that statute, Congress criminalized the transportation of prison-made goods in interstate commerce (with certain exceptions) unless the employer paid "wages at a rate which is not less than that paid for work of a similar nature in the locality in which the work was performed." 18 U.S.C. § 1761(c)(1) (1984). Requiring that prisoners receive a minimum wage for their labor furthers the goal of preventing unfair competition.
 
 
 24
 Finally, prior decisions of this and other circuits bolster our conclusion that inmates can be employees under the FLSA. This circuit has held that a prisoner working in a prison library can be an employee of the prison for purposes of Title VII. Baker v. McNeil Island Corrections Center, 859 F.2d 124, 128 (9th Cir.1988). Although the FLSA and Title VII are different statutes, "cases construing the definitional provisions of [Title VII] are persuasive authorities when interpreting [the FLSA or the ADEA]" because the definition of "employee" in the three Acts is virtually identical. Hyland v. New Haven Radiology Assocs., 794 F.2d 793, 796 (2nd Cir.1986). In Baker, we concluded that the high degree of control exercised in the prison context made it more, not less, likely that the prisoner was an employee of the prison. 859 F.2d at 128. Moreover, Baker specifically rejected the argument, advanced again here, that inmate work assignments were not employment relationships because they "are more in the nature of rehabilitation and employment training than in the nature of commercial employment." Id.
 
 
 25
 The Second and the Fifth Circuits have both concluded that the FLSA can apply to inmates in some circumstances. In Carter v. Dutchess Community College, 735 F.2d 8, 15 (2nd.Cir.1984), the Second Circuit "emphatically" held that "the fact that [Carter] is a prison inmate does not foreclose his being considered an employee for purposes of the minimum wage provisions of the FLSA." Id.; see also Watson v. Graves, 909 F.2d 1549, 1554 (5th Cir.1990) ("We agree with the Carter court that status as an inmate does not foreclose inquiry into FLSA coverage").
 
 
 26
 In light of the purpose of the FLSA, the structure of that Act, and the Supreme Court and circuit precedent interpreting it and analogous statutes, we conclude that Congress did not intend automatically to exclude inmate employees from the protections of the Act. We next consider whether the inmates in the cases before us were in an employment relationship with ARCOR.
 
 
 27
 2. The Existence of an Employment Relationship
 
 
 28
 a. The Legal Standard
 
 
 29
 Whether an employment relationship exists under the FLSA depends on the "economic reality" of the employment situation. Goldberg, 366 U.S. at 33, 81 S.Ct. at 936. This circuit, in deciding if an employer/employee relationship exists, has applied an "economic reality" test which looks to four factors: whether the alleged employer (1) had the power to hire and fire employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records. Bonnette v. California Health & Welfare Agency, 704 F.2d 1465, 1470 (9th Cir.1983). The evaluation of the relationship as a whole, however, depends not on isolated factors but "upon the circumstances of the whole activity." Rutherford Food, 331 U.S. at 730, 67 S.Ct. at 1477. The Bonnette factors "are not etched in stone and will not be blindly applied." Bonnette, 704 F.2d at 1470. As a result, failure to satisfy one of the factors is not automatically fatal to a worker's claim.
 
 
 30
 Two prior cases in this circuit have applied the "economic reality" test in the prison context. In Baker, we concluded that Title VII can apply to prison inmates. 859 F.2d at 128. Central to this conclusion was our determination that "the most important factor--the extent of the employer's right to control the means and manner of the worker's performance--strongly suggests because of the prison context that the plaintiff was an employee." Id. In other words, the high degree of control exercised by the prison over the inmate made it more likely that an inmate working for the prison was an employee.
 
 
 31
 In Gilbreath, we again considered the "economic reality" test as applied to inmates. There, members of this court expressed three widely divergent views on the question of when a prisoner is an employee. In an alternative holding,[5] Judge Trott concluded that the DOC was not an employer because it had too much control over the prisoners. He explained: "The state's absolute power over appellants is a power that is not a characteristic of--and indeed is inconsistent with--the bargained-for exchange of labor which occurs in a true employer-employee relationship." 931 F.2d at 1325.
 
 
 32
 Judge Rymer's concurrence recognized that the determination of an employment relationship between prisons and inmates must be considered on a "case by case" basis. Id. at 1331 (Rymer, J., concurring in the judgment). Judge Rymer determined that the DOC met the four Bonnette factors in that case: it had the power to hire and fire inmate workers, it had ultimate responsibility for hiring inmates and for paying them, and their work was performed within the prison and therefore was under at least partial supervision by prison employees. Id. at 1330.[6] Nonetheless, Judge Rymer concluded that the DOC was not an employer because "[t]he relationship between prison and prisoner was entirely custodial, bearing none of the indicia of a traditional employment relationship such as the exercise of discretion and exchange of wages for labor." Id. at 1331. She also concluded that paying inmates subminimum wages would not result in unfair competition with outside workers because the labor product in that case "belongs to the institution." Id.[7] Judge Rymer apparently went beyond the Bonnette factors, finding three other considerations important: whether low inmate wages would create unfair competition, whether the prison exercised its discretion in choosing workers, and whether the prison received labor in exchange for wages. Those considerations led her to find no employment relationship in Gilbreath because the DOC acted merely as a conduit between inmates and a private firm (Cutter Biological).
 
 
 33
 Finally, Judge D.W. Nelson's dissent applied the four factors set forth in Bonnette. Judge Nelson concluded that those factors were met in Gilbreath, and therefore that the DOC was an employer. Id. at 1335 (D.W. Nelson, J., dissenting). Judge Nelson rejected Judge Trott's argument that the DOC had too much control over the inmates on the grounds that it was inconsistent with Baker, and rejected Judge Rymer's focus on the three new factors as inconsistent with the purposes of the FLSA.
 
 
 34
 The guidance we are given by these widely divergent opinions is not entirely clear. On the one hand, Gilbreath could stand for the proposition that because prisons exercise such complete control over their inmates, a court applying the economic reality test can never find inmates to be employees. See id. at 1325 (Trott, J.). Of course, that sweeping conclusion commanded only one vote in Gilbreath. Even more problematic, such a conclusion would put Gilbreath squarely in conflict with Baker, which not only held that inmates could be employees but also reasoned that the high degree of control in the prison context made it more, not less, likely that inmates were employees. See Baker, 859 F.2d at 128.[8] When presented with such a conflict, we must distinguish the two cases if at all possible; if it is impossible, we must call for en banc review. Atonio v. Wards Cove Packing Co., 810 F.2d 1477, 1478-79 (9th Cir.1987) (en banc).[9]
 
 
 35
 We conclude that the appropriate reading of Gilbreath is one which adopts Judge Rymer's conclusion that the existence of an employment relationship must be determined on a case-by-case basis. When neither a single opinion nor a single line of analysis commands the support of the majority of a panel, the holding of the case is "that position taken by those Members who concurred in the judgments on the narrowest grounds." Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977) (quoting Gregg v. Georgia, 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 2923 n. 15, 49 L.Ed.2d 859 (1976)). Judge Rymer's opinion decides the case on the narrowest grounds possible, because it requires a case by case analysis rather than drawing a categorical conclusion. Further, Judge Rymer's opinion avoids a conflict with Baker, since it does not hold that inmates can never be employees and does not focus on the level of control exercised by the prison. We therefore proceed to a case-by-case application of the Bonnette factors. In addition, because Bonnette does not purport to provide an exhaustive list of factors, we will consider as well those factors Judge Rymer found significant in Gilbreath.
 
 
 36
 b. Fuller
 
 
 37
 The inmates in Fuller all work in the ARCOR program, which is run by the DOC. The state through the ARCOR program has the undisputed power to hire and fire the inmates. Further, ARCOR and the DOC are solely responsible for supervising and controlling inmate work schedules and conditions of employment. The DOC also determines the rate and method of payment, is actually responsible for paying the inmates, and maintains whatever employment records exist. The four factors traditionally associated with the economic reality test are therefore met in this case. See Bonnette, 704 F.2d at 1470.
 
 
 38
 We turn next to the three considerations identified by Judge Rymer. The first factor suggesting an employment relationship is the risk of unfair competition posed by workers in a particular case. That risk is present here. The ARCOR program produces products for competition with private industry as well as products for state use only. For example, inmates in the ARCOR program produce goods for the private sector, such as hogs for Farmer John meats in California, steel bed frames and mattresses. They also produce goods for state and local governments, such as license plates and printed forms, some of which are sold to states other than Arizona. Under these circumstances, it certainly cannot be said that the products pose no risk of unfair competition with private employers. To the contrary, the inmates in ARCOR appear to be in direct competition with farmers and producers of beds and mattresses in the outside world. Because of their low wage rates, the ARCOR industries have an unfair advantage in that competition.
 
 
 39
 The second concern expressed by Judge Rymer is whether the employer and the employee can exercise discretion in the relationship. That factor too is present here. In order to obtain an ARCOR position, an inmate must apply for a particular position, the ARCOR division must have space available and must find the inmate acceptable, and the DOC must approve the inmate as a low security risk. The inmate has discretion both in deciding whether to apply to ARCOR at all[10] and in choosing a division for which he wishes to work. In turn, ARCOR has discretion not to hire an inmate either because it has no suitable positions available or because it believes the inmate is unqualified. Discretion in the creation of the employment relationship clearly exists in this case.
 
 
 40
 The final factor Judge Rymer found significant, the "exchange of wages for labor," Gilbreath, 931 F.2d at 1331, is present here as well. In Gilbreath, the inmates were working directly for a private company. Although they were paid by the DOC, the DOC was merely acting as a conduit for their wages, which ultimately were paid by the private company. Judge Rymer's opinion concluded in that case that the DOC was not exchanging wages for labor with the inmates. In Fuller, by contrast, ARCOR employs the inmates directly. The inmates provide labor to ARCOR which is used to make goods which ARCOR sells. The inmates are paid by ARCOR out of its profits from the sale of those goods. Unlike the DOC in Gilbreath, ARCOR in this case "purchases" inmate labor directly.
 
 
 41
 All the factors identified by Bonnette suggest that the inmates in Fuller, who work directly for ARCOR enterprises, are in an employment relationship with ARCOR. The considerations raised by Judge Rymer in applying Bonnette to the prison context also point towards an employment relationship in this case. That relationship is subject to the provisions of the FLSA. We conclude that the district court in Fuller erred in dismissing the plaintiffs' FLSA claims.
 
 
 42
 c. Hale
 
 
 43
 In Hale, the appellant worked for an inmate-owned business operated under ARCOR's IOBE program that sold belt buckles in interstate commerce. Appellant argues that he was employed by the state because the DOC effectively controlled the business. Again, we consider each of the factors enumerated above.
 
 
 44
 The first Bonnette factor, ability to hire and fire employees, seems to suggest an employment relationship. Although it is true that the inmate owners select who they want to hire and fire, they can do so only with ARCOR and DOC approval. The DOC regularly exercised its control over inmate selection. DOC's power to fire an inmate without any approval from the IOBE owner suggests that the inmate owner's role is advisory rather than controlling. The first factor is met, therefore, because the DOC effectively controlled the hiring and firing of IOBE workers.
 
 
 45
 Whether the second factor, control over work schedules and conditions of employment, is met is unclear. On the one hand, the inmate owners themselves operate under the close supervision of the DOC. The on-site ARCOR employee known as the Business Manager manages all inmate operated business enterprises. The warden and the ARCOR business manager must approve all IOBE applications. All contracts between an IOBE and a third party are reviewed by the ARCOR manager and all business shipments are processed through the ARCOR manager. Finally, the DOC monitors inmates while they work not only for security reasons, but also to assure that they are working on their assignments. On the other hand, it is clear that the day to day operations of the business, such as ordering, advertising, manufacturing and shipping, are run by the inmate owner himself, not by ARCOR. Moreover, an inmate employee contracts with the inmate owner directly, not with ARCOR, and the owner ordinarily sets the hours and the general terms of employment.
 
 
 46
 The third factor, the paying of wages, militates in favor of finding an employment relationship. The DOC pays the inmate worker the wages owed by the owner. Although the DOC is merely passing wages paid by the inmate owner on to the inmate workers, Judge Rymer found in Gilbreath that such a relationship was sufficient to meet this factor. Furthermore, the DOC must approve the amount the inmates are paid, and ARCOR monitors the finances of all IOBE businesses. Finally, the DOC takes a percentage of the gross sales of the IOBE business as "rent." This factor favors the characterization of the inmate-ARCOR relationship as an employment relationship.
 
 
 47
 The fourth Bonnette factor is whether the putative employer keeps employment records. It is unclear from the record who, if anyone, maintains such records. This factor is therefore ambiguous.
 
 
 48
 Judge Rymer's opinion in Gilbreath also looks at whether an inmate's employment at substandard wages presents a risk of unfair competition. In this case, Berry--the plaintiff in Hale--was employed by an IOBE which made belt buckles and sold them in interstate commerce. The labor product did not "belong to the institution"; it was introduced into outside commerce in direct competition with other goods. Such a risk does exist in this case.
 
 
 49
 Next, Judge Rymer found significant whether ARCOR and the inmates exercise discretion in choosing to enter the employment relationship. This factor also bolsters the conclusion that the parties are in an employment relationship, albeit less strongly than it did in Fuller. The Hale inmates can exercise their discretion in choosing to work for an IOBE, and in choosing to which IOBE they wish to apply. IOBE owners have some power to accept or reject employees. As we noted above, however, this "power" is largely advisory, and it is ARCOR which possesses most of the discretion, particularly in firing inmates.
 
 
 50
 Judge Rymer's final indicator of an employment relationship is the exchange of labor for wages. This factor counsels against finding an employment relationship. Inmates are paid solely out of the profits of the IOBE, and the DOC merely acts as a conduit, passing money from the IOBE to the inmate workers. Thus, the value of the inmates' labor benefits the IOBE owner rather than ARCOR or the DOC. Although the DOC does take a percentage of the IOBE's profits out as "rent," and therefore receives some of the value of the inmate labor, the inmates are not working directly "for" ARCOR or the DOC, but for the inmate owner.
 
 
 51
 ARCOR's relationship with the inmates in this case falls somewhere in between Fuller and Gilbreath. Unlike Fuller, there is no one unified entity performing all the traditional functions of an employer. Unlike Gilbreath, however, the intermediary between ARCOR and the inmates is not an independent private company, but rather an IOBE under the ultimate control of ARCOR itself. We conclude that the plaintiff in Hale was an employee of ARCOR. The most important factors--the hiring and firing of employees, the paying of wages, and the risk of unfair competition--all point to an employment relationship. Further, even in those factors which are ambiguous, such as the day-to-day control over working conditions, ARCOR exercises a strong degree of control. ARCOR is the entity ultimately responsible for determining whether an inmate has a job, and the circumstances under which that job is performed. We therefore conclude that ARCOR is an employer for purposes of the FLSA.
 
 
 52
 Even were we to conclude that ARCOR alone was not an employer, however, we would reach the same result, because we conclude that the IOBE is not an independent entity, but rather a subsidiary of ARCOR under its direct day-to-day control. In addition to the elements of control identified above--ARCOR's and DOC's control over hiring and firing, the routine intervention of the ARCOR Business Manager, and the fact that ARCOR serves as a financial conduit for the IOBE and audits its books--appellants point to many indicia of control to prove that the state controls the IOBEs. All contracts of any kind between an IOBE enterprise and another company are reviewed by the ARCOR business manager. An IOBE can only operate in fields designated by ARCOR, and IOBEs must be approved by the DOC as well. An IOBE's legal status is as a subsidiary: they are "formed as a unit of Arcor Enterprises." An inmate can only become an IOBE owner with approval of the warden, and the warden, the ARCOR manager or its Board can suspend the business for any or no reason. The warden and ARCOR business managers must approve all IOBE employment applications. Finally, all equipment and supplies are registered as owned by the DOC, and the number of workers an IOBE may employ is limited by the DOC.
 
 
 53
 The great control ARCOR and the DOC exercise over the IOBEs indicates that the IOBEs are not separate entities but rather are arms of ARCOR itself. Since ARCOR and the IOBEs are in essence a single entity, "the characteristics of each [can] be aggregated to show that that single entity [is] an employer." Gilbreath, 931 F.2d at 1329 n. 2 (Rymer, J., concurring in the judgment). Treated as a single entity, ARCOR and the IOBE certainly meet all of the factors set out in Bonnette and Gilbreath, and constitute employers subject to the provisions of the FLSA. We conclude that the district court erred in granting summary judgment in Hale.
 
 V. ARIZONA LAW
 
 54
 Appellants in both Hale and Fuller also sought relief under an Arizona statute which they argue creates an obligatory duty to pay inmates minimum wages. Ariz.Rev.Stat. § 31-254. Both district courts dismissed the state claims on the grounds that they were barred by the Eleventh Amendment. In Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), the Supreme Court held that the Eleventh Amendment deprives federal courts of jurisdiction to order state actors to comply with state law. As the Court stated, "[i]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." Id. at 106, 104 S.Ct. at 911; see also Gilbreath, 931 F.2d at 1327. Appellants' state law claims are barred by the Eleventh Amendment.
 
 VI. SECTION 1983 CLAIMS
 
 55
 Appellants argue that Ariz.Rev.Stat. § 31-254 creates a property interest in minimum wages which the state cannot deny without due process of law. By failing to afford them notice and a hearing before depriving them of minimum wages, appellants argue, the defendants have denied them due process. They seek relief under 42 U.S.C. § 1983, which provides a cause of action to plaintiffs whose federal rights are denied "under color of state law." The plaintiffs in Fuller sought both damages and declaratory and injunctive relief against the state, ARCOR, and officials of both the state and ARCOR. The plaintiffs in Hale sought only monetary relief against the defendants. The district courts in both Hale and Fuller denied appellants' request for damages on the basis of the Eleventh Amendment. The court in Fuller found that Ariz.Rev.Stat. § 31-254 did create a property interest in wages. It retained the case "in the limited sense that if plaintiffs succeed on this claim the court may grant prospective-injunctive or declaratory relief." The court in Hale did not recognize a property or liberty interest created by state law.
 
 A. Amenability of Defendants to Suit
 
 56
 Appellees argue that the court need not reach the merits of the section 1983 claim because they are immune from suit under section 1983. As to the state of Arizona itself, this is unquestionably true. The Supreme Court held in Will v. Michigan Dept. of State Police, 491 U.S. 58, 71, 109 S.Ct. 2304, 2311, 105 L.Ed.2d 45 (1989) that a state is not a "person" amenable to suit under section 1983. This rule extends to "arms of the state." Id. at 70, 109 S.Ct. at 2311; Gilbreath, 931 F.2d at 1327. Insofar as they are directed against the state itself or the DOC, therefore, appellants' claims for both damages and injunctive relief must fail.
 
 
 57
 On the other hand, the individual defendants may be sued both for injunctive relief and for damages in their individual capacity, even though they are officers of the state and even if they were acting in their official capacity when they performed the acts complained of. See Hafer v. Melo, --- U.S. ----, 112 S.Ct. 358, 362-63, 116 L.Ed.2d 301 (1991) (state officers acting in their official capacity may be sued for damages in their individual capacity under section 1983); Edelman v. Jordan, 415 U.S. 651, 664, 94 S.Ct. 1347, 1356, 39 L.Ed.2d 662 (1974) (state officials may be sued in federal court for prospective, nonmonetary relief). The Court in Hafer rejected the argument that "imposing personal liability on state officers may hamper their performance of public duties," concluding that neither the Eleventh Amendment nor the terms of section 1983 itself barred such suits. 112 S.Ct. at 364-65.
 
 
 58
 A more difficult case is presented by ARCOR. If it is an "arm of the state," then it cannot be sued under section 1983. Will, 491 U.S. at 70, 109 S.Ct. at 2311. Appellants argue that the action is not barred because ARCOR and its funding are independent from the state. We consider the following factors in determining whether an entity is independent of the state: "whether a money judgment would be satisfied out of state funds, whether the entity performs central governmental functions, whether the entity may sue and be sued, whether the entity has the power to take property in its own name or only the name of the state, and the corporate status of the entity." Mitchell v. Los Angeles Community College Dist., 861 F.2d 198, 201 (9th Cir.1988), cert. denied, 490 U.S. 1081, 109 S.Ct. 2102, 104 L.Ed.2d 663 (1989). "To determine these factors, the court looks to the way state law treats the entity." Id. at 201.
 
 
 59
 Arizona intended ARCOR to be self-sufficient. Arizona law provides that "Arizona Correctional Industries shall defray its costs, on an accrual basis, out of receipts from the sale of articles and products." Ariz.Rev.Stat. § 41-1629(C). All profits from ARCOR enterprises are deposited in a revolving fund separate from the state's general fund. Ariz.Rev.Stat. § 41-1629(D) (1989). All costs for the correctional industries are paid from this fund. Ariz.Rev.Stat. § 41-1624(A).[11]
 
 
 60
 There is nothing in the record indicating whether a judgment could be completely satisfied from money held in this revolving fund. However, absolute certainty that damages will not be paid from state funds has never been a prerequisite to permitting a suit against a government agency. Travelers Indem. Co. v. School Bd. of Dade County, 666 F.2d 505, 509 (11th Cir.1982) ("Eleventh Amendment protection is available only if satisfaction of the judgment sought against the state 'agency' must under all circumstances, be paid out of state funds."), cert. denied, 459 U.S. 834, 103 S.Ct. 77, 74 L.Ed.2d 74 (1982); see Edelman v. Jordan, 415 U.S. 651, 668, 94 S.Ct. 1347, 1358, 39 L.Ed.2d 662 (1974) (suit barred by the Eleventh Amendment where there was a "virtual certainty" that damages would be paid from state funds). The first Mitchell factor, therefore, weighs in favor of the conclusion that ARCOR is independent of the state.
 
 
 61
 The second factor in the Mitchell test also militates in appellants' favor. Although the prison system itself is certainly performing a central government function, it is difficult to see what central government function is being undertaken by a state-run factory or commercial enterprise, particularly one which by law is "deemed a private enterprise". Ariz.Rev.Stat. 41-1623(D)(3).
 
 
 62
 The last three factors seek to determine whether the entity has legal power in its own name. As applied to ARCOR, these factors are inconclusive. ARCOR has the power to purchase supplies and to pay all obligations. Ariz.Rev.Stat. § 41-1622. Further, ARCOR has its own budget and annual report. Ariz.Rev.Stat. § 41-1623(H), (I). However, it also appears that only the DOC is empowered to enter into contracts. Ariz.Rev.Stat. § 41-1623.
 
 
 63
 Finally, given the importance under the Mitchell test of how state law treats an entity, it is significant that Arizona law provides that ARCOR is "deemed a private enterprise." Ariz.Rev.Stat. 41-1623(D)(3). Balancing all of these factors, it seems clear that Arizona intended ARCOR to operate as a private, profit-oriented commercial enterprise independent of state government. Under these circumstances, we conclude that ARCOR is not an "arm of the state" and is therefore amenable to suit under section 1983.
 
 B. Deprivation of Due Process
 
 64
 Finally, we turn to the merits of appellants' claims against ARCOR and the individual defendants. There is no question that inmates have a property right to receive a minimum wage. In Piatt v. MacDougall, 773 F.2d 1032, 1036 (9th Cir.1985) (en banc), we concluded that Arizona law was "unambiguous" in requiring that prisoners be paid at least a minimum wage, relying on Ariz.Rev.Stat. §§ 31-254 and 41-1624.01. We held in Piatt that due process required that Arizona prisoners be given a "meaningful" predeprivation hearing before being deprived of this minimum wage. 773 F.2d at 1036; see also Gilbreath, 931 F.2d at 1327 (same). Appellants in this case alleged that they were denied such a hearing, and the defendants do not appear to contest this allegation. The district court in Hale erred in refusing to recognize this right. The district court in Fuller correctly denied summary judgment as to appellants' claim for prospective relief. Both courts correctly granted summary judgment for the state of Arizona on the damages claim, but erred in granting summary judgment on the damages claims in favor of ARCOR and the individual defendants. Appellants in both cases are entitled to pursue the remaining claims on remand.
 
 CONCLUSION
 
 65
 The district court's decision in Hale v. Arizona, No. 88-15785, granting summary judgment on plaintiff's FLSA claims is REVERSED. Its dismissal of plaintiff's state law claims is AFFIRMED. Its grant of summary judgment on plaintiff's section 1983 claim for monetary damages is REVERSED as to all parties except the state of Arizona and the DOC.
 
 
 66
 The district court's decision in Fuller v. Arizona, No. 89-15162, dismissing plaintiffs' FLSA claims is REVERSED. Its dismissal of plaintiffs' state law claims is AFFIRMED. Its denial of summary judgment on plaintiffs' section 1983 claims seeking injunctive and declaratory relief is AFFIRMED, but its grant of summary judgment on plaintiffs' section 1983 claims seeking damages is REVERSED as to all parties except the state of Arizona and the DOC.
 
 
 67
 Appellants shall recover their costs on appeal. AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 
 FLETCHER, Circuit Judge, dissenting:
 
 68
 With great reluctance, I dissent. The two cases before us are controlled by Gilbreath v. Cutter Biological, 931 F.2d 1320 (9th Cir.1991), a case which also presented the issue of whether inmates in the Arizona prison system were entitled to be paid the minimum wage. Judge Rymer's concurrence in Gilbreath, which the majority correctly identifies as the holding in the case, precludes a finding that the inmates in the two cases before us are covered by the FLSA.[1]
 
 
 69
 In Gilbreath, the Arizona DOC and a private entity each had some of the characteristics we identified with "employer" status in Bonnette v. California Health and Welfare Agency, 931 F.2d 1465 (9th Cir.1983). However, Judge Rymer found neither entity was an "employer" within the meaning of the FLSA. Most significant here is her discussion of the role of the DOC. Judge Rymer emphasized that the relationship between a prison and an inmate is in its very nature far different from a traditional employer/employee relationship, because "inmate labor belongs to the institution." Gilbreath, 931 F.2d at 1331 (Rymer, J., concurring). She noted there was "no evidence that the DOC had a pecuniary, rather than penological, interest in inmate labor." Id. at 1330. She also made the point that where the inmates are employed by the prison itself, " '[there is no] fear of "upsetting the desired equilibrium in the work place", because the "work place" [is] the prison itself.' " Id. at 1331 (citing Watson v. Graves, 909 F.2d 1549, 1555 (5th Cir.1990). All of these reasons, in her view, precluded a finding that the FLSA applied to inmates working for the DOC within the walls of Arizona prisons.
 
 
 70
 In the majority's analysis of whether an employer/employee relationship exists in the two cases before us, the same Arizona DOC plays a significant role. In Fuller, the inmates work for ARCOR, which is run by the DOC. In Hale, the inmates work for ARCOR and for the IOBEs, which are themselves subsidiaries of ARCOR. It is difficult to see how the DOC's interests in Hale and Fuller are different from those Judge Rymer identified in Gilbreath, even if some of the employer supervisory, decisionmaking or recordkeeping functions are distributed somewhat differently. The majority does not succeed in escaping Judge Rymer's conclusion that the labor of Arizona prison inmates, employed by and within the prison system, "belongs to the institution."
 
 
 71
 In its effort to distinguish Gilbreath, the majority notes that the inmates in Hale and Fuller produce goods that compete in the marketplace with privately produced goods. However, Judge Rymer's focus was not on the possibility of unfair competition in the products marketplace, but in the market for labor. Because the inmates worked in an entirely different setting than non-inmates, she saw prison labor as no threat to " 'the standard of living and general well being of the worker in American industry.' " Gilbreath, 931 F.2d at 1331 (Rymer, J., concurring) (quoting Alexander v. Sara, Inc., 721 F.2d 149, 150 (5th Cir.1983) (per curiam)). Because Hale and Fuller are, like Gilbreath, inmates, working within the prison walls, their cases cannot be distinguished on this point.
 
 
 72
 I share the majority's evident disagreement with the outcome in Gilbreath. However, it is the law of this court, and it is dispositive in this case. Thus, I dissent.
 
 ORDER
 
 73
 Sept. 16, 1992.
 
 
 74
 Before: WALLACE, Chief Judge, BROWNING, HUG, TANG, SCHROEDER, FLETCHER, FARRIS, PREGERSON, ALARCON, POOLE, D.W. NELSON, CANBY, NORRIS, REINHARDT, BEEZER, HALL, WIGGINS, BRUNETTI, KOZINSKI, NOONAN, THOMPSON, O'SCANNLAIN, LEAVY, TROTT, FERNANDEZ, RYMER, T.G. NELSON, and KLEINFELD, Circuit Judges.
 
 
 75
 Upon the vote of a majority of nonrecused regular active judges of this court, it is ordered that this case be reheard by the en banc court pursuant to Circuit Rule 35-3.
 
 
 
 [1]
 While Hale was not a class action, numerous plaintiffs in positions similar to Berry joined in the action. Only Berry joined in this appeal, however
 
 
 [2]
 Plaintiffs in Fuller sought declaratory and injunctive relief establishing that they were entitled to notice and a hearing before being deprived of their right to a minimum wage
 
 
 [3]
 In any event, by taking an appeal "as to all issues" decided below, including the section 1983 claims brought only against the individual defendants, the plaintiffs in Hale provided sufficient notice to those defendants that the judgment in their favor was being appealed as well
 
 
 [4]
 We have faced this precise question only once before, in Gilbreath v. Cutter Biological, Inc., 931 F.2d 1320 (9th Cir.1991). In Gilbreath, Judge Trott's opinion concluded that the FLSA was not intended to apply to prisoners at all. 931 F.2d at 1324-25. Judge D.W. Nelson's dissent, on the other hand, concluded that the FLSA was intended to apply to prisoners. Id. at 1333-34 (D.W. Nelson, J., dissenting). Judge Rymer's concurring opinion expressly refused to reach the issue. Id. at 1328 n. 1 (Rymer, J., concurring in the result). Because there was no majority holding on the issue, we consider the question anew here
 
 
 [5]
 As noted ante, Judge Trott concluded that the FLSA did not apply to prisoners at all. He nonetheless proceeded to apply the "economic reality" test to the facts of that case. Rather than drawing a conclusion applicable to those facts, however, Judge Trott concluded that "[t]he results of such application reveal why the FLSA itself cannot be said to cover prison labor...." Gilbreath, 931 F.2d at 1325
 
 
 [6]
 It was not clear from the record in Gilbreath who kept employment records
 
 
 [7]
 The Gilbreath opinions are silent on what, if any, product the inmates helped produce, and on who purchased or used that product
 
 
 [8]
 Judge Trott distinguished Baker on the grounds that it dealt with Title VII, not the FLSA. Gilbreath, 931 F.2d at 1325. The two acts have essentially identical definitions of "employee," however. To distinguish Baker on this ground would put this circuit in direct conflict with the Second Circuit, and would run contrary to the reasoning of the Supreme Court. Hyland v. New Haven Radiology Assocs., 794 F.2d 793, 796 (2nd Cir.1986); cf. Rutherford Food Corp. v. McComb, 331 U.S. 722, 723, 67 S.Ct. 1473, 1473, 91 L.Ed. 1772 (1947) (National Labor Relations Act definition of employee, which is virtually identical to FLSA's definition, is authority for determining coverage of FLSA). As Judge Rymer reminds us, "we are to avoid creating intercircuit conflict when possible." Gilbreath, 931 F.2d at 1328 n. 1 (Rymer, J., concurring in the judgment); see United States v. Gwaltney, 790 F.2d 1378, 1388 n. 4 (9th Cir.1986), cert. denied, 479 U.S. 1104, 107 S.Ct. 1337, 94 L.Ed.2d 187 (1987)
 
 
 [9]
 To take the opposite course--to follow Judge D.W. Nelson's dissent--would give no effect to the result reached by a majority of the Gilbreath panel
 
 
 [10]
 Although all inmates in the Arizona prison system must work in some capacity, only about ten percent of Arizona inmates work in the ARCOR program. The rest do institutional work for the prison itself
 
 
 [11]
 At the time this suit was brought, inmates' wages could not be paid with state general fund monies. Ariz.Rev.Stat. § 41-1624(A)(2) (since amended)
 
 
 [1]
 Judge Rymer did not join Judge Trott's conclusion that inmates can never be employees for FLSA purposes, finding that on the facts of Gilbreath an employer/employee relationship did not exist. Gilbreath, 931 F.2d at 1328 n. 1. (Rymer, J., concurring). Judge Rymer's opinion appears to leave some room for possible FLSA coverage for inmates in situations where prisoners might be on work release or otherwise working outside prison walls or in a position to compete with non-inmate workers for jobs. See id., 931 F.2d at 1330. Those circumstances were not present in Gilbreath. I, too, find it unnecessary to reach this issue in our cases, because they also can be resolved on factual grounds