Gregory J. McMASTER, Elizabeth Krogstad, Harold Gustafson, Michael Giest, Guy Hathaway, John E. Liljedahl, Timothy S. Smith, Shawn Hubbard, James Scott, Rickey J. Sistad, and Gerald Norris, on behalf of themselves and all other persons similarly situated, Plaintiffs,

v.

STATE OF MINNESOTA; Orville Pung, Minnesota Commissioner of Corrections; Jean Whitney, Administrative Assistant to the Commissioner of Corrections; Donald G. Tomsche, Correctional Administrator to Minnesota Department of Corrections; Dennis Benson, Warden, Minnesota Correctional Facility—Oak Park Heights; Pat Adair, Superintendent, Minnesota Correctional Facility—

Shakopee; Robert Erickson, Warden, Minnesota Correctional Facility—Stillwater; Fred Holbeck, Superintendent, Minnesota Correctional Facility—Faribault; G. Fred Lafleur, Superintendent, Minnesota Correctional Facility—Lino Lakes; Leroy Siegal, Superintendent, Minnesota Correctional Facility—St. Cloud; Thomas F. Grogan, Director, Minnesota Correctional Facility—Oak Park Heights Industries; Frank Wood, Minnesota Deputy Commissioner of Corrections; Guy Piras, Assistant Director, Minnesota Correctional Facility—Oak Park Heights Industries; Jim Rariek, Supervisor, Complex 4, Minnesota Correctional Facility—Oak Park Heights Industries; John Doe, Mary Roe, and Persons Unknown, Defendants.

Civ. 4–92–1058.

United States District Court,
D. Minnesota,
Fourth Division.

April 29, 1993.

Richard G. Nadler, Thomas J. Lyons, St. Paul, MN, Heidi H. Crissey, John R. Wylde, Jr., Minneapolis, MN, for plaintiffs.

Hubert H. Humphrey, III, Minnesota Atty. Gen., and Blair A. Rosenthal and Jocelyn F. Olson, Asst. Attys. Gen., St. Paul, MN, for defendants.

## MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

This matter is before the Court on defendants' motion for dismissal and partial summary judgment. The motion will be granted.

## FACTS

This is a class action brought by current and former inmates of various Minnesota correctional facilities. Defendants include the state of Minnesota, the Commissioner of the Department of Corrections (DOC), and various state officials involved with prison industries operated by the DOC. The prison industries were established pursuant to Minn.Stat. § 241.27, which allows the DOC to establish industrial and commercial activities at correctional institutions to provide vocational training and employment to inmates. The industries produce items such as furniture, truck and auto body products, mattresses, textiles, and notebooks; they also provide services such as data entry, assembly, market research, and printing to private compa-nies with whom the state has contracts. Plaintiffs allege that defendants sell prison industry products in interstate commerce to governmental entities and to the private sector. They further allege that in 1991, total sales for the prison industries exceeded $11 million, and forty percent of the sales were in the private sector.

Compensation paid to inmates working in prison industries is determined by the commissioner of the DOC, pursuant to Minn.Stat. § 243.23, subd. 1, which allows the commissioner to pay inmates according to the quality and character of the work performed. Plaintiffs allege that they are paid between fifty and seventy-five cents per hour. Although Minnesota law allows many inmates to reduce their sentences by accruing good time, inmates who refuse available work assignments in the prison industries may not earn good time for any day on which they do not perform a work assignment. Minn.Stat. § 243.18.

Plaintiffs allege that defendants have violated their constitutional and statutory rights by failing to pay inmates minimum or prevailing wages for work performed in prison industries, and by punishing inmates who refuse to work by depriving them of good time. Plaintiffs seek relief on behalf of two classes of individuals. The first class includes individuals who have worked in prison industries and have not received lawful wages; the second class includes inmates who have lost good time as a result of refusing to work in the industries. Defendants move to dismiss Counts 1, 2, 4, 5, and 6 of the complaint, which raise claims under the Federal Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201–219, the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968, various amendments to the United States Constitution, and 18 U.S.C. § 1761. Defendants also move for dismissal or summary judgment on Count 3, which alleges that defendants have retaliated against some of the named plaintiffs because of their participation in this lawsuit.

## DISCUSSION

In reviewing a motion to dismiss for failure to state a claim the Court presumes all factual allegations to be true and all reasonable

inferences from those allegations are construed in favor of the non-moving party. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Palmer v. Tracor, Inc.,* 856 F.2d 1131, 1132 (8th Cir.1988). The appropriate inquiry is not whether plaintiff will ultimately prevail but whether he will be allowed to introduce evidence to support his claims. *Scheuer,* 416 U.S. at 236, 94 S.Ct. at 1686. Because dismissal on the pleadings is an extreme remedy it is not favored by the courts and is employed only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957) (footnote omitted). *Robinson v. MFA Mutual Insurance Co.,* 629 F.2d 497, 500 (8th Cir.1980). *See also Palmer,* 856 F.2d at 1132. [1]

## I. *Eleventh Amendment Immunity*

At the outset, defendants argue that the Eleventh Amendment shields the state of Minnesota and the individual defendants in their individual capacity from suit on all of plaintiffs' claims except the claims arising under the FLSA. Plaintiffs argue that neither the state nor the individual officials are immune from suit under the Eleventh Amendment.

■ The Eleventh Amendment bars suits against states or state entities unless the state has waived its immunity or Congress has overridden it. *Kentucky v. Graham,* 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 3106 n. 14, 87 L.Ed.2d 114 (1985). The Eleventh Amendment bar applies regardless of the relief sought. Thus, the general rule is that a state cannot be sued directly in its own name. *Id.* Where plaintiffs seek injunctive or declaratory relief under federal law, they may overcome the state's immunity by naming state officials in their official capacity as defendants; they may not, however, obtain an award of monetary damages against state officials in their official capacity because such an award would be in effect an award against the state. *Id.* at 169, 105 S.Ct. at 3107.

■ Defendants concede that the plaintiffs' FLSA claims are not barred by the Eleventh Amendment, because the United States Supreme Court has held that the FLSA applies to the states. *Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985). Defendants assert, however, that neither the state as an entity nor the state officials in their official capacity are subject to suit on plaintiffs' remaining claims. Defendants correctly point out that the state itself is not subject to suit under section 1983 because states and state entities are not "persons" within the meaning of that section. *Will v. Michigan Department of State Police,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). Nor are states subject to suit under RICO, absent a state waiver of immunity. *See Bair v. Krug,* 853 F.2d 672 (9th Cir. 1988). Therefore, defendants assert that with the exception of the FLSA claim, all claims against the state and the individual defendants in their official capacity must be dismissed.

In response, plaintiffs do not argue that the state of Minnesota has waived its sovereign immunity for plaintiffs' non-FLSA claims, or that Congress has abrogated the state's immunity on those claims. Instead,

---

1. Plaintiffs have submitted numerous exhibits along with their memorandum in opposition to the motion to dismiss. Defendants object to the introduction of the exhibits except to the extent that they bear on defendants' motion for summary judgment on Count 3 of the complaint. Under Federal Rule of Civil Procedure 12(b), the Court may accept matters outside the pleadings and treat the motion as one for summary judgment where it would expedite resolution of the matter to do so. Plaintiffs' exhibits consist of documents that plaintiffs believe provide factual support for the allegations of the complaint. Because all allegations are taken as true in a mo-

tion to dismiss, and because defendants' motion to dismiss raises solely legal issues, the Court need not consider the material presented in plaintiffs' exhibits. Moreover, because defendants object to converting their motion to dismiss to a motion for summary judgment and have offered nothing beyond the pleadings to supplement the record, it would be inappropriate to convert the motion to one for summary judgment. Therefore, the Court will exclude all matters outside the pleadings, except to the extent that they bear on the summary judgment motion on Count 3.

plaintiffs assert that where the commerce clause is involved, the state does not have complete immunity. In support of this assertion, plaintiffs rely on *Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989). As defendants point out, however, *Union Gas* holds that Congress has authority under the commerce clause to abrogate sovereign immunity for claims arising under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA). As this case involves no CERCLA claim, *Union Gas* is simply inapplicable. Because it is clear that the state of Minnesota is not subject to suit on plaintiffs' non-FLSA claims, those claims must be dismissed insofar as they seek to impose liability against the state itself.

■ However, the claims against the individual defendants in their official capacity cannot be dismissed in their entirety on Eleventh Amendment grounds. Defendants rely on *Will* to support their argument that plaintiffs' non-FLSA claims against the individual defendants in their official capacity must be dismissed. This argument misstates the reach of *Will.* As noted above, the Eleventh Amendment does not bar suits for injunctive or declaratory relief against state officials. Consistent with this rule, *Will* holds that suits seeking prospective injunctive relief against state officials in their official capacity are permissible under section 1983 because they are not treated as actions against the state. *Will,* 491 U.S. at 71 n. 10, 109 S.Ct. at 2311 n. 10. Because plaintiffs seek both injunctive relief and monetary relief, the Eleventh Amendment bars their non-FLSA claims against the individual defendants in their official capacity only to the extent that plaintiffs seek monetary damages for those claims.

## II. *The FLSA Claim*

■ The FLSA requires covered employers to pay their employees a minimum hourly wage, which is currently $4.25. 29 U.S.C. § 206(a)(1). The Act defines critical terms in circular fashion. "Employer" is defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee," while "employee" is defined as "any individual employed by an employer." 29 U.S.C. § 203(d), (e)(1). "Employ" is defined as "to suffer or permit to work." 29 U.S.C. § 203(g). Courts are to construe the terms "employee" and "employer" expansively in order to further the congressional goal of outlawing from interstate commerce goods produced in violation of the Act. *Nationwide Mutual Insurance Co. v. Darden,* —— U.S. ——, 112 S.Ct. 1344, 1350, 117 L.Ed.2d 581 (1992); *Tony & Susan Alamo Foundation v. Sec. of Labor,* 471 U.S. 290, 296, 105 S.Ct. 1953, 1959, 85 L.Ed.2d 278 (1985). Where the status of employer and employee is uncertain, it is the economic reality of the relationship, and not technical concepts of employment, that control. *Tony & Susan Alamo,* 471 U.S. at 301, 105 S.Ct. at 1961; *Goldberg v. Whitaker House Cooperative, Inc.,* 366 U.S. 28, 33, 81 S.Ct. 933, 936, 6 L.Ed.2d 100 (1960).

■ There are numerous reported decisions in which prisoners have raised FLSA wage claims against private companies with whom the state has contracted to provide inmate labor. In this situation, courts have generally held that the prisoners had no claim under the FLSA, either because prisoners are not employees within the meaning of the Act, or because the private companies were not the prisoners' employers under the economic reality test. *Gilbreath v. Cutter Biological, Inc.,* 931 F.2d 1320 (9th Cir.1991); *Alexander v. Sara, Inc.,* 721 F.2d 149 (5th Cir.1983); *Sims v. Parke Davis & Co.,* 334 F.Supp. 774 (E.D.Mich.), *aff'd.* 453 F.2d 1259 (6th Cir.1971), *cert. denied,* 405 U.S. 978, 92 S.Ct. 1196, 31 L.Ed.2d 254 (1972); *Hudgins v. Hart,* 323 F.Supp. 898 (E.D.La.1971); *Huntley v. Gunn Furniture Co.,* 79 F.Supp. 110 (W.D.Mich.1948); *Prieur v. D.C.I. Plasma Center,* 102 Nev. 472, 726 P.2d 1372 (1986); *Lavigne v. Sara, Inc.,* 424 So.2d 273 (La.Ct.App.1982); *Manville v. Board of Governors of Wayne State,* 85 Mich.App. 628, 272 N.W.2d 162 (1978); *but see Watson v. Graves,* 909 F.2d 1549 (5th Cir.1990) (inmates who worked for a construction company outside prison grounds were employees of the company); *Carter v. Duchess Community College,* 735 F.2d 8 (2d Cir.1984) (an inmate who worked as a teaching assistant for a

community college was an employee of the college).

This case presents a slightly different question than the cases cited above, because plaintiffs are pressing their FLSA claim not against the private companies with whom the state contracts, but against the state itself. As is the case for FLSA actions against private employers, most courts considering FLSA claims against states and state entities have held in favor of the state. *Harker v. State Use Industries,* 990 F.2d 131 (4th Cir. 1993); *Vanskike v. Peters,* 974 F.2d 806 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1303, 122 L.Ed.2d 692 (1993); *Gilbreath,* 931 F.2d 1320 (9th Cir.1991); *Miller v. Dukakis,* 961 F.2d 7 (1st Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 666, 121 L.Ed.2d 590 (1992); *Worsley v. Lash,* 421 F.Supp. 556 (N.D.Ind.1976); *Quigg v. South,* 243 Mont. 218, 793 P.2d 831 (1990); *McGinnis v. Stevens,* 543 P.2d 1221 (Alaska 1975); *see also Alvarado Guevara v. Immigration & Naturalization Service,* 902 F.2d 394 (5th Cir.1990) (alien detainees not employees of INS); *Emory v. United States,* 2 Cl.Ct. 579 (Cl.Ct.), *aff'd,* 727 F.2d 1119 (Fed.Cir.1983) (prisoner working in federal prison industries not employee of federal government). Defendants rely on this line of cases in general, and on *Vanskike* in particular, to argue that plaintiffs' FLSA claims must fail because plaintiffs are not employees within the meaning of the Act, and because no employer/employee relationship exists between plaintiffs and the state.

Plaintiffs in turn rely on *Hale v. State of Arizona,* 967 F.2d 1356 (9th Cir.1992), in which the court held that inmates who worked for Arizona Correctional Industries were employees within the meaning of the FLSA. The Court declines to follow *Hale,* for several reasons. First, the Court notes that the precedential value of *Hale* is uncertain. The *Hale* decision appears to conflict

with *Gilbreath v. Cutter Biological, Inc.,* 931 F.2d 1320 (9th Cir.1991), in which a different panel of the Ninth Circuit held that the FLSA did not cover prisoners working within the prison for a private plasma center; perhaps because of this conflict, the Ninth Circuit has decided to reconsider *Hale* en banc.

Second, *Hale* is not factually analogous to the case at bar. In *Hale,* the prisoners worked for an entity that was deemed to be a private enterprise under state law and was intended by the state to operate as a profit-oriented commercial enterprise. Here, the industries in which plaintiffs work are not private entities. Rather, under Minnesota law, they are enterprises that are created, owned, and operated by the DOC. Minn. Stat. § 241.27.[2]

Third, the result reached in *Hale* is against the weight of authority. To the extent that *Hale* holds that inmates working on prison grounds and performing work for private entities are employees under the FLSA, the decision is something of an anomaly. As noted above, numerous reported decisions hold that private companies who use inmate labor pursuant to a contractual arrangement with the state are not employers within the meaning of the FLSA.[3] To the extent that *Hale* holds that a prisoner working within a prison and for the prison is an employee of the prison for FLSA purposes, the case is also an anomaly, because the vast majority of cases hold that in such a situation the prisoner is not a state employee. For these reasons, both the Seventh Circuit and the Fourth Circuit have expressly declined to follow *Hale. Vanskike v. Peters,* 974 F.2d 806 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1303, 122 L.Ed.2d 692 (1993); *Harker v. State Use Industry Envelope Shop Inmates,* 990 F.2d 131 (4th Cir.1993).

2. Plaintiffs' contention that the status of the prison industries involved in this case is a factual question is without merit. As defendants point out, plaintiffs' complaint does not allege that the industries are private enterprises. Even if it did, the legal characterization of a state-created entity is a question of law, not of fact.

3. Those cases are, however, somewhat different from *Hale,* because while the earlier cases involved private industries that had contracted with the state, *Hale* involved a state-created entity within the department of corrections that was treated as a private enterprise under state law. *Hale,* 967 F.2d at 1360. Thus, the result in *Hale* may be explained by the unique status of the employing entity under state law.

The Court concludes that Eighth Circuit, like the Seventh and Fourth Circuits, would decline to follow *Hale*. The Eighth Circuit considered a prisoner's claim for wages under the FLSA in *Wentworth v. Solem*, 548 F.2d 773 (8th Cir.1977). The plaintiff in *Wentworth* was an inmate in a state penitentiary who alleged, among other things, that state prison officials had violated the FLSA by failing to pay him the federal minimum wage for work he performed in the prison's bookbinding shop. The court held that the plaintiff had failed to state a claim under the FLSA, because the Act did not extend coverage to state employees under *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976).

The holding in *Wentworth* does not control this case because the United States Supreme Court reversed *Usery* and extended FLSA coverage to state employees in *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985). However, in addition to holding that the FLSA did not extend to state employees, the *Wentworth* court stated, "we are doubtful that Congress ... intended to extend the coverage of the minimum wage law to convicts working in state prison industries." *Wentworth*, 548 F.2d at 775. This statement is a strong indication that the Eighth Circuit would reject a construction of the FLSA that would include within the definition of employee a prisoner performing work for the prison itself.

In arguing that prisoners are employees within the meaning of the FLSA, plaintiffs point out that Congress specifically exempted certain employees from FLSA coverage in 29 U.S.C. § 213. Because Congress did not include prisoners in the list of exempted employees, plaintiffs argue that it must be assumed that Congress intended them to be covered by the FLSA. However, as a matter of statutory interpretation, the Court agrees with the *Vanskike* court that "common linguistic intuitions ... are at least strained by the classification of prisoners as 'employees' of the [department of corrections] or of the

State." *Vanskike*, 874 F.2d at 807. Moreover, if prisoners do not fall within the meaning of employee in the first place, their omission from section 213's list of exempted employees does not indicate a congressional intent to confer FLSA coverage upon them. *Vanskike*, 974 F.2d at 807 n. 2; *Harker*, 990 F.2d at 132–33.

In any event, the Court need not decide whether prisoners can ever be considered employees for purposes of the FLSA, because under the facts alleged here, it is clear that no employer/employee relationship exists between plaintiffs and the state. In support for their argument that such a relationship does exist, plaintiffs rely heavily on the fact that the state contracts directly with outside employers to produce products and perform services; for example, plaintiffs point out that the state contracts with private entities to provide data processing and telemarketing, which are performed by inmates. Because non-inmates performing this type of work would surely be protected by the FLSA, plaintiffs assert that they too must be covered by the Act.

Plaintiffs do not allege that any of the entities with whom the state contracts is an employer within the meaning of the FLSA. Instead, they apparently argue that the state's contracts with private companies somehow convert the relationship between plaintiffs and defendants into an employment relationship within the meaning of the Act. Plaintiffs cite no authority to support such a proposition. Moreover, plaintiffs' focus on the nature of the work they perform is misplaced. Coverage under the FLSA turns not on the nature of the work performed, but on the economic reality of the relationship between the alleged employer and the alleged employee. *See, e.g., Vanskike*, 974 F.2d at 808.

Where, as here, inmates work in the prison and for the prison pursuant to penalogical work assignments, the economic reality is that they are not employees. *Vanskike*, 974 F.2d at 810.[4] Plaintiffs have neither con-

---

4. Plaintiffs attempt to distinguish *Vanskike* on the grounds that the inmate in that case merely performed janitorial and kitchen work within the

prison. This assertion is simply incorrect. The inmate in *Vanskike* not only performed janitorial and kitchen work, but worked as a piece-line

tracted with the government to become employees nor engaged in a bargained-for exchange of labor for consideration. Rather, they have been assigned work within prison industries for the purposes of training, rehabilitation, and reduction of idleness. Thus, the relationship between plaintiffs and the state is not an employment relationship, but a custodial relationship to which the FLSA does not apply. *Harker*, 990 F.2d at 132–33.

■ Moreover, because plaintiffs are required to work as part of their sentences of incarceration, they are in fact engaged in involuntary servitude, not employment. The law is clear that prisoners may be required to work and that any compensation for their labor exists by grace of the state. *Vanskike*, 974 F.2d at 809 (citing *Draper v. Rhay*, 315 F.2d 193, 197 (9th Cir.), *cert. denied*, 375 U.S. 915, 84 S.Ct. 214, 11 L.Ed.2d 153 (1963); *Sigler v. Lowrie*, 404 F.2d 659 (8th Cir.1968), *cert. denied*, 395 U.S. 940, 89 S.Ct. 2010, 23 L.Ed.2d 456 (1969)). The mere fact that prisoners may be required to work without compensation does not foreclose the possibility that a right to compensation could be conferred upon them by statute. *Vanskike*, 974 F.2d at 809. But the Thirteenth Amendment's exclusion of prisoner labor from the prohibition on involuntary servitude is a strong indication that as a matter of economic reality, prisoners working for the prison itself are not employed by the prison within the meaning of the FLSA.

■ This conclusion is consistent with the purposes behind the FLSA. The FLSA was intended both to provide a minimum standard of living to American workers and to eliminate unfair competition resulting from the use of underpaid labor. *Vanskike*, 974 F.2d at 810. The first of these purposes has no application to prisoners, whose basic needs are met by the state. Nor does the second purpose of the FLSA require that coverage under the Act be extended to plain-

tiffs. It does not appear that the prison industries for which plaintiffs work present a substantial threat of unfair competition. By statute, the prison industries are to operate "for the primary purpose of providing vocational training, meaningful employment and the teaching of proper work habits to the inmates ... and not as competitive business ventures." Minn.Stat. § 241.27, subd. 1.[5] Plaintiffs assert that as a factual matter, Minnesota prison industries do operate as competitive business ventures, and that until factual questions regarding the competitive nature of the industries are resolved, summary judgment would be inappropriate. The Court concludes, however, that even if plaintiffs were able to establish that the prison industries in fact operate as competitive industries, their FLSA claim would fail. Although one of the purposes underlying the FLSA was to prevent unfair competition, application of the Act does not turn upon whether a particular entity operates as a competitive business.

In addition, as both the *Vanskike* court and the *Harker* court noted, Congress has chosen to deal with the problem of unfair competition from prison-made goods not through the FLSA, but through the Ashurst–Sumners Act, 18 U.S.C. §§ 1761–62, which criminalizes the transportation of prison-made goods in interstate commerce. *Vanskike*, 974 F.2d at 811–12; *Harker*, 990 F.2d at 134. The existence of the Ashurst–Sumners Act undermines plaintiffs' argument that the FLSA was intended to combat unfair competition resulting from the use of prison labor. Because the Ashurst–Sumners Act assumes that the use of prison labor will result in low-cost goods, it presupposes that the labor of prisoners belongs to the institution. *Vanskike*, 974 F.2d at 812. In recognition of this fact, Congress specifically exempted from the Ashurst–Sumners Act commodities manufactured by prisoners for use

worker in the prison knit shop as well. *Vanskike*, 974 F.2d at 806. Moreover, the *Vanskike* court expressly rejected an interpretation of the FLSA under which coverage would turn upon whether inmates performed services for the prison itself or produced goods for distribution beyond prison walls. *Id.* at 811.

**5.** Minnesota law does provide that private corporations may lease facilities on the grounds of state correctional institutions and employ selected inmates at those facilities; in such cases, however, state law requires the corporations to pay the inmates prevailing wages. Minn.Stat. § 243.88.

by federal, state or local governments. 18 U.S.C. § 1761(b). The governmental use exemption indicates both that Congress intended to let government reap the benefits of prison labor and that Congress has rejected the notion that all governmental uses of prison labor unduly obstruct fair competition. *Vanskike,* 974 at 811–12; *Harker,* 990 F.2d at 134. Applying the FLSA to plaintiffs would directly conflict with the governmental use exemption, because it would require the payment of the federal minimum wage in all instances.

 In addition to the governmental use exemption, the Ashurst–Sumners Act contains an exemption allowing the interstate transportation of goods produced under the Bureau of Justice's Private Sector/Prison Industry Enhancement Certification Program (Prison Industry Certification Program), provided that the inmates who produced the goods were paid the prevailing local rate for their work. 18 U.S.C. § 1761(c). The prevailing wage requirement insures that the availability of prison-made goods will not hamper fair competition. *Harker,* 990 F.2d at 133–34. The prevailing wage requirement was enacted in 1979, more than forty years after the FLSA was enacted. Pub.L.No. 96–157, 93 Stat. 1215 (1979). If Congress believed that the FLSA applied to prison labor, it would have had no reason to amend the Ashurst–Sumners Act to exempt goods produced for prevailing wages under the Prison Industry Certification Program; thus, to adopt plaintiffs' reading of the FLSA would be to render the later enactment wholly superfluous. *See Vanskike,* 974 F.2d at 812; *Harker,* 990 F.2d at 134–35. Because Congress dealt specifically with the threat of unfair competition from prison-made goods in the Ashurst–Sumners Act, it is that statute, and not the FLSA, that controls.

In sum, the Court concludes that where, as here, inmates perform work for the prison and at the direction of the prison as part of their sentences, the relationship between the state and the inmates is not an employer/employee relationship that is governed by the FLSA. Accordingly, plaintiffs' claim for wages under the FLSA will be dismissed.

## III. *The Section 1983 Claims*

In Counts 2, 4, and 6 of the complaint, plaintiffs allege that defendants have violated 42 U.S.C. § 1983 by depriving them of their rights under color of state law. Section 1983 provides a cause of action for violations of both federal statutes and the United States Constitution. *Wilder v. Virginia Hospital Association,* 496 U.S. 498, 508, 110 S.Ct. 2510, 2517, 110 L.Ed.2d 455 (1990). Plaintiffs assert that defendants have deprived them of their rights by violating the Ashurst–Sumners Act and the Fifth, Eighth, Thirteenth, and Fourteenth Amendments to the United States Constitution.

### A. Ashurst–Sumners Act

Section 1761 of the Ashurst–Sumners Act provides:

> Whoever knowingly transports in interstate commerce . . . any goods, wares, or merchandise manufactured, produced, or mined, wholly or in part by convicts or prisoners . . . shall be fined . . . or imprisoned . . . or both.

18 U.S.C. § 1761(a). As noted above, the prohibition on transporting convict-made goods does not apply to goods manufactured for governmental use or goods manufactured by prisoners participating in certain prison work pilot projects, if the prisoners have been paid wages comparable to those paid to non-inmate laborers for similar work. 18 U.S.C. § 1761(b), (c). Plaintiffs assert that defendants have violated section 1761 by transporting in interstate commerce goods produced by inmates who were not paid prevailing wages. Defendants deny that they have transported prison-made goods in interstate commerce. They assert, however, that even if they had violated the statute, plaintiffs' section 1761 claim would fail because plaintiffs have no enforceable rights under the statute.

 Defendants correctly point out that plaintiffs have no private right of action under section 1761. *Wentworth v. Solem,* 548 F.2d 773, 775 (8th Cir.1977).[6] The una-

**6.** As discussed above, the portion of *Wentworth* dealing with FLSA claims by prisoners has been

vailability of a private right of action under a federal statute, however, does not foreclose the possibility of obtaining relief for violations of the statute under section 1983. *Wilder,* 496 U.S. at 508 n. 9, 110 S.Ct. at 2517 n. 9. In order to establish a private right of action under a federal statute, a plaintiff must establish both that he is "one of the class for whose *especial* benefit the statute was enacted" and that Congress intended to provide him a private remedy. *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975) (emphasis in original); *Touche Ross v. Redington,* 442 U.S. 560, 575, 99 S.Ct. 2479, 2488, 61 L.Ed.2d 82 (1979). Those seeking to enforce a federal statute through section 1983 are relieved of the burden of establishing that Congress intended to provide them with a private remedy, because section 1983 constitutes express congressional authorization for private suits. *Wilder,* 496 U.S. at 508 n. 9, 110 S.Ct. at 2517 n. 9. However, a mere violation of federal law will not support a section 1983 claim: section 1983 can be used to enforce a federal statute only if the statute creates a federal right. Whether the statute creates such a right depends upon whether it was intended to benefit the putative plaintiff. *Wilder,* 496 U.S. at 508, 110 S.Ct. at 2517 (citing *Golden State Transit Corp. v. Los Angeles,* 493 U.S. 103, 105, 110 S.Ct. 444, 448, 107 L.Ed.2d 420 (1989)). This inquiry is essentially the same as the first prong of the *Cort v. Ash* test. *New York Airlines v. Dukes County,* 623 F.Supp. 1435 (D.Mass.1985). Thus, in order to prevail on a section 1983 claim based on section 1761 violations, plaintiffs must establish that the section was enacted for their especial benefit.

 In determining whether section 1761 creates rights in favor of plaintiffs, the Court must analyze the statute in detail, taking into account the entire legislative enactment. *Suter v. Artist M.,* —— U.S. ——, 112 S.Ct. 1360, 1367, 118 L.Ed.2d 1 (1992). Section 1761 was originally enacted in 1935 as part of the Ashurst–Sumners Act. 49 Stat. 494 (1935). As originally enacted, the statute prohibited interstate transportation of all convict-made goods, except those manufactured in federal correctional institutions for use by the federal government. The original purpose of the statute was to protect private business from unfair competition from low-cost, convict-made goods. *Kentucky Whip & Collar Co. v. Illinois Central Railroad Co.,* 299 U.S. 334, 351, 57 S.Ct. 277, 282, 81 L.Ed. 270 (1937); *Wentworth,* 548 F.2d at 775; *Vanskike,* 974 F.2d at 811.

Section 1761 was amended in 1948 to exempt from coverage agricultural commodities, parts for farm machinery, and commodities manufactured for use by state or local governments. Pub.L. No. 772, 62 Stat. 695 (1948). The statute was amended again by the Justice System Improvement Act of 1979. Pub.L. No. 96–157, 93 Stat. 1215 (1979). The 1979 amendments authorized the federal law enforcement assistance administration to designate seven pilot projects in which inmates would produce goods that would be exempt from the prohibition on the transportation of convict-made goods; the exemption was conditioned on inmates working voluntarily and being paid prevailing wages for their labor. Pub.L. No. 96–157 § 827(a) (codified at 18 U.S.C. § 1761(c)). Under the amended statute, wages earned by inmates in the pilot programs were subject to deductions for taxes, room and board charges, family support payments, and contributions to victim compensation funds. *Id.*

Pursuant to this statutory authority, the Prison Industry Certification Program was established. H.R.Rep. No. 101–681(I), *reprinted in* 1990 U.S.C.C.A.N. 6472, 6608. The Prison Industry Certification Program was expanded by the Justice Assistance Act of 1984, which increased the number of authorized pilot projects from seven to twenty. Pub.L. No. 98–473, 98 Stat. 2077, 2102 (1984). The Senate Report accompanying the 1984 amendment indicates that the program was expanded because "the designated projects have been successful in teaching inmates marketable job skills, reducing the need for their families to receive public assistance,

---

overruled by a subsequent United States Supreme Court ruling. *Wentworth*'s holding regarding a private cause of action under section 1761, however, was not affected by the Supreme Court ruling, and remains good law.

decreasing the net cost of operating correctional facilities, and breaking the recidivist cycle." S.Rep. No. 98–225, *reprinted in* 1984 U.S.C.C.A.N. 3182, 3463.

In 1990, Congress amended section 1761 once again to expand the Prison Industry Certification Program to fifty non-federal prison work pilot projects. Pub.L. No. 101–647 § 2906, 104 Stat. 4789, 4914 (1990). The House Report accompanying the amendment discusses the prevailing wage provision in detail:

> Also of importance to the [Prison Industry Certification Program] is the payment of prevailing wages. With the earned wages, offenders can make a substantial contribution to society. Permissible deductions include room and board payments, Federal and state taxes, Social Security and family support. Between five and 20 percent of the inmate's gross wages is mandatorily paid to victim's compensation programs....
>
> ....
>
> The benefits of this program are numerous, with the reduction of the cost of incarceration being the most notable. It is also an effective way of occupying the growing prison population and reducing idleness, while at the same time expanding the available supply of goods and services. For the victims of crime, it is a means of partial reparation. For the inmates, the program provides them with a marketable skill, offering a chance of rehabilitation, as well as a way of meeting financial obligations while incarcerated.

H.R.Rep. No. 101–681(I), *reprinted in* 1990 U.S.C.C.A.N. 6472, 6608–09 (1990).

Plaintiffs rely upon the legislative history of the 1984 and 1990 amendments to argue that Congress specifically intended the prevailing wage provision of section 1761 to benefit them. The Court reads the legislative history differently. The enactment of the prevailing wage provision is consistent with the original goal of section 1761: it allowed states to develop meaningful prison industry programs, while continuing to protect private business from unfair competition resulting from low-cost, prison-made goods. The legislative history cited by plaintiffs does indicate that in enacting the prevailing wage provision, Congress had more in mind than merely safeguarding against unfair competition; Congress also intended the Prison Industry Certification Program and its prevailing wage requirement to help reduce inmate idleness, recidivism rates, and the costs of incarceration. Those benefits, however, accrue not specifically to inmates, but to prison administrators and to society in general. Moreover, although the prevailing wage provisions were intended to help inmates meet their financial obligations while incarcerated, it is again society in general that benefits from the inmates' ability to do so: society gains if prisoners pay taxes, support their families, and compensate their victims.

In short, the legislative history cited by plaintiffs indicates that the primary purpose of the prevailing wage provision was to benefit society in general by eliminating unfair competition, reducing the direct and indirect costs of incarceration, and enhancing rehabilitation efforts. The prevailing wage provision may also benefit prisoners such as plaintiffs, but the fact that a statute has the subsidiary purpose of benefiting a given class of persons does not establish that it creates enforceable rights in their favor. *Cort*, 422 U.S. at 80–81. Because plaintiffs have failed to demonstrate that the prevailing wage provision was enacted for their especial benefit, the Court holds that they may not enforce the provision under section 1983.

**B. The Constitutional Claims**

 Plaintiffs allege that by requiring them to work in prison industries under threat of losing good time and by failing to pay them minimum or prevailing wages for their work, defendants have violated the Fifth, Eighth, Thirteenth and Fourteenth Amendments. Plaintiffs' Eighth and Thirteenth Amendment claims can be easily resolved. The Thirteenth Amendment provides that "[n]either slavery nor involuntary servitude, *except as a punishment for crime whereof the party shall have been duly convicted,* shall exist within the United States, or any place subject to their jurisdiction" (emphasis added). Because the prohibition on involuntary servitude does not extend to

those who have been convicted of crimes, compelling prison inmates to work does not violate the Thirteenth Amendment. *United States v. Reynolds,* 235 U.S. 133, 149, 35 S.Ct. 86, 90, 59 L.Ed. 162 (1914); *Mosby v. Mabry,* 697 F.2d 213 (8th Cir.1982). *See also Sigler v. Lowrie,* 404 F.2d 659, 661 (8th Cir.1968), *cert. denied,* 395 U.S. 940, 89 S.Ct. 2010, 23 L.Ed.2d 456 (1969) (there exists no constitutional right to be paid for work performed during imprisonment).

 Prison work requirements may constitute cruel and unusual punishment in violation of the Eighth Amendment if prison officials knowingly compel convicts to perform labor that is beyond their strength, endangers their lives or health, or is unduly painful. *Ray v. Mabry,* 556 F.2d 881, 882 (8th Cir.1977); *Franklin v. Banks,* 979 F.2d 1330 (8th Cir.1992). However, plaintiffs have alleged no facts suggesting that any of these circumstances exist. Rather, they assert that it is cruel and unusual punishment for prison officials to force them to engage in work that violates section 1761. This argument merely repeats plaintiffs' section 1761 arguments, which the Court has already rejected. Moreover, plaintiffs have cited no authority to support such a reading of the Eighth Amendment. Because the Thirteenth Amendment specifically countenances forced labor during incarceration, and because plaintiffs have alleged no facts indicating that the circumstances under which they performed their labor constitute cruel and unusual punishment, the Court will dismiss the Eighth and Thirteenth Amendment claims.

 Although plaintiffs' due process claims have not been well-articulated, they appear to raise not a procedural due process claim, but a takings claim: they assert that defendants' failure to pay them the wages required by the FLSA and section 1761 is a taking for which they have not been compensated. In order to maintain either a proce-

dural due process claim or a takings claim plaintiffs must first establish that they have a protected property interest. *Education Assistance Corp. v. Cavazos,* 902 F.2d 617, 626 (8th Cir.), *cert. denied,* 498 U.S. 896, 111 S.Ct. 246, 112 L.Ed.2d 205 (1990). Defendants contend that plaintiffs' due process claim must fail because neither state nor federal law gives plaintiffs a protected property interest in receiving minimum or prevailing wages for work performed in the prison industries. Plaintiffs apparently concede that they have no property interest in receiving a given wage under state law.[7] They assert, however, that the FLSA and section 1761 give them a protected property interest in receiving minimum or prevailing wages. The Court has already concluded that plaintiffs have no enforceable right to receive minimum or prevailing wages under the FLSA or section 1761; therefore, plaintiffs may not rely on those provisions to establish a due process claim.

## IV. *The RICO Claim*

 Count 5 of plaintiffs' complaint alleges that defendants have violated RICO because "through a pattern of deception and the use of the mails, the wires, and through interstate commerce, [they] have developed an enterprise for the purpose of selling goods in interstate commerce produced by persons who are paid unlawful wages." Compl. ¶ 55. Generally, RICO prohibits four types of activity: (1) investing income derived from a pattern of racketeering activity in an enterprise that affects interstate or foreign commerce, (2) acquiring an interest in such an enterprise through a pattern of racketeering activity, (3) conducting the affairs of such an enterprise through a pattern of racketeering activity, and (4) conspiring to engage in any of the first three activities. 18 U.S.C. § 1962. The statute defines "racketeering activity" as "any act or threat involving" specified state law crimes, any "act" indictable under various specified federal statutes,

---

7. Any claim to a state-created property interest in a given wage would likely fail, because decisions regarding whether to pay inmates for their work in prison industries and what amount to pay them are committed to the discretion of the commissioner of the DOC. Minn.Stat. § 243.23,

subd. 1. In a case involving similar statutes, the Eighth Circuit has held that inmates have no state-created property interest in receiving wages. *Hrbek v. Farrier,* 787 F.2d 414 (8th Cir. 1986).

and certain federal "offenses." *H.J., Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 232, 109 S.Ct. 2893, 2897, 106 L.Ed.2d 195 (1989) (citing 18 U.S.C. § 1961(1)). Defendants assert that plaintiffs' RICO claim must be dismissed because plaintiffs have failed to adequately allege that defendants have engaged in any sort of racketeering activity within the meaning of RICO.

Defendants first point out that although plaintiffs state in the jurisdictional section of their complaint that their RICO claim is based on defendants' violations of criminal statutes regarding obstruction of criminal investigations (18 U.S.C. § 1510) and interference with commerce by threats of violence (18 U.S.C. § 1951), neither those statutes nor any facts suggesting a violation of those statutes appear in the substantive allegations of the complaint. Thus, defendants argue that any RICO claim predicated on violations of sections 1510 and 1951 must be dismissed because plaintiffs have failed to make allegations that would give defendants fair notice of such a claim.

Federal Rule of Civil Procedure 8 requires plaintiffs to provide a statement of facts sufficient to give defendants notice of the plaintiffs' claim and the grounds upon which the claim rests. *Connelly v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Baxley–DeLamar Monuments v. American Cemetery Ass'n,* 843 F.2d 1154, 1156 (8th Cir.1988). The Court finds that plaintiffs have failed to meet this minimal pleading requirement with regard to their section 1510 and section 1951 claims. Neither the complaint nor plaintiffs' memorandum provides any indication that defendants have interfered with commerce by threats or violence or have obstructed a criminal investigation. Therefore, the Court will dismiss plaintiffs' RICO claim insofar as plaintiffs base that claim on violations of sections 1510 and 1951.

 Defendants next argue that plaintiffs' conclusory allegation that defendants have used the mails and wires to advance an unlawful enterprise is insufficient to sustain a RICO claim based on mail or wire fraud. Federal Rules of Civil Procedure 9(b) provides that where a plaintiff alleges fraud, the circumstances constituting that fraud must be pled with particularity. Thus, litigants pleading RICO violations must allege the time, place, and content of all false representations. *Lange v. Hocker,* 940 F.2d 359, 362 (8th Cir.1991) (quoting *Lally v. Crawford County Trust & Savings Bank,* 863 F.2d 612, 613 (8th Cir.1988)). In *Lange,* the plaintiffs alleged that the defendants had violated RICO by illegally obtaining control of a closely-held corporation engaged in equestrian training and equine research. The complaint alleged that the defendants had executed their scheme by contacting various horse owners through the use of interstate mail and telephone systems. The court held that this allegation was too vague and conclusory to be the basis of a RICO claim, and therefore affirmed the district court's dismissal of the complaint.

In this case, as in *Lange,* plaintiffs' allegations regarding mail and wire fraud are simply too vague to meet the particularity requirements of Rule 9(b). Plaintiffs have asserted that the defendants have used the mails and wires to further their allegedly fraudulent scheme, but have provided no details regarding the alleged violation. Because the plaintiffs have failed to plead their mail and wire fraud claim with the required specificity, it will be dismissed.

 Finally, defendants assert that plaintiffs cannot base their RICO claim on defendants' failure to pay them prevailing wages because even if defendants had violated 18 U.S.C. § 1761, such a violation would not constitute "racketeering activity" within the meaning of RICO. As noted above, RICO defines "racketeering activity" in terms of violations of certain specified state and federal laws. 18 U.S.C. § 1961(1). Section 1761 is not one of the specified federal laws. Therefore, plaintiffs may not premise their RICO claim upon a section 1761 violation. Because plaintiffs have failed to adequately allege a RICO claim, the claim will be dismissed.

## V. *The Retaliation Claim*

Count 3 of the complaint alleges that defendants have retaliated against some in-

mates for their participation in this lawsuit. The complaint alleges two types of retaliatory activity. First, the complaint alleges that the defendants laid off inmate workers and announced that the lay-offs were caused by plaintiffs' threatened challenge to defendants' failure to pay minimum or prevailing wages. This conduct, according to plaintiffs, put them in physical danger. Second, the complaint alleges that defendants have retaliated against some of the named plaintiffs by ransacking their cells while they were meeting with their attorneys regarding this lawsuit. The complaint alleges that defendants engaged in this conduct in order to dissuade plaintiffs from exercising their legal and constitutional rights.

 Defendants first argue that these allegations are too conclusory to state a claim for retaliation. The Court is not persuaded by this argument. Although neither party has addressed the law on which plaintiffs' retaliation claim is based, it appears that plaintiffs are claiming that defendants have interfered with their constitutional right of access to the courts. A claim that state officials have taken retaliatory action against individuals to punish them for having exercised their constitutional right to seek judicial relief or to intimidate them from exercising their rights in the future clearly states a claim upon which relief may be granted. *Harrison v. Springdale Water & Sewer Comm'n,* 780 F.2d 1422, 1427–28 (8th Cir. 1986). In the instant case, plaintiffs have alleged that defendants have taken specific actions that were intended to dissuade them from exercising their right to seek a ruling on their wage claims. Those allegations are sufficient to withstand a motion to dismiss.

 Alternatively, defendants argue that they are entitled to summary judgment on the retaliation claim. A movant is not entitled to summary judgment unless the movant can show that no genuine issue exists as to any material fact. Fed.R.Civ.P. 56(c). In considering a summary judgment motion, a court must determine whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The role of a court is not to weigh the evidence but instead to determine whether, as a matter of law, a genuine factual conflict exists. *AgriStor Leasing v. Farrow,* 826 F.2d 732, 734 (8th Cir.1987). "In making this determination, the court is required to view the evidence in the light most favorable to the nonmoving party and to give that party the benefit of all reasonable inferences to be drawn from the facts." *AgriStor Leasing,* 826 F.2d at 734. When a motion for summary judgment is properly made and supported with affidavits or other evidence as provided in Fed.R.Civ.P. 56(c), then the nonmoving party may not merely rest upon the allegations or denials of the party's pleading, but must set forth specific facts, by affidavits or otherwise, showing that there is a genuine issue for trial. *Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.,* 824 F.2d 582, 585 (8th Cir.1987), *cert. denied,* 484 U.S. 1010, 108 S.Ct. 707, 98 L.Ed.2d 658 (1988). Moreover, summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

To support their retaliation claim, plaintiffs proffer affidavits of two of the named plaintiffs in this action. The first, Ricky J. Sistad, was incarcerated at the Minnesota Correctional Facility—Oak Park Heights (MCF–OPH) until October 1, 1992, when he was extradited to Wisconsin. He asserts that three weeks prior to his extradition, and before prison officials were aware that he was going to be transferred to Wisconsin, his supervisor informed him that another inmate was going to be trained for his job as a shop clerk. Sistad asserts that his supervisor "clearly intended to replace me because of [my] participation in the pending inmate litigation." Affidavit of Ricky J. Sistad ¶ 2. The affidavit does not provide the facts underlying this conclusion. Sistad further alleges that on September 23, 1992, approximately two hours after he met with his attorneys regarding this action, his cell was

searched. He states, "I was given the strong message by MCF–OPH staff that said action was the direct result of my participation in the then pending litigation." *Id.* at ¶ 3. Again, the affidavit does not provide the facts underlying this conclusion.

The second inmate, James L. Scott, is currently incarcerated at MCF–OPH. He states that in July 1992 he and his fellow inmates Ron Moten and Juan Gatlin were informed that they were being laid off. According to Scott, Moten asked why he was being laid off and stated that he was not involved in any lawsuit involving inmate wages. Scott states that the MCF–OPH resident program manager replied that it was true that Moten was not involved in a lawsuit but that Scott was involved in such a suit. Scott asserts that the resident program manager's statement "placed me in the position of having other inmates apply pressure on me not to pursue this litigation and of having other inmates blame me for being laid-off from work." Affidavit of James L. Scott ¶ 5.

Defendants do not dispute that the acts Sistad and Scott complain of occurred; however, they contend that none of the actions were taken in retaliation for the inmates' participation in this lawsuit. Defendants assert that another inmate was trained for Sistad's position as a shop clerk not because Sistad was challenging the defendants' failure to pay minimum or prevailing wages, but because in August 1992 Sistad told his foreman that he might be extradited to Wisconsin and that he wanted a less demanding position than that of shop clerk. Affidavit of Richard E. Traynor ¶ 3. Defendants also assert that because of frequent turnover within the prison industries, it is common practice to train potential replacements for inmates and to maintain a reserve of at least two inmates who are qualified to assume any given position. *Id.* ¶ 5. Finally, defendants state that after the other inmate was trained to perform Sistad's former job, Sistad was given work as a slitter, and was told that when he returned from Wisconsin he would be restored to his former position as a shop clerk if he so chose. *Id.* ¶ 4. Given these facts, defendants argue, plaintiffs' allegation

that the training of a replacement worker was a retaliatory act is simply unsupportable.

Defendants maintain that Sistad's allegations that his cell was searched because he is involved in this litigation is similarly unsupportable. They point out that MCF–OPH has a random "shakedown" policy, under which a computer randomly selects two rooms per week in each complex for a thorough search. Affidavit of Lynn Dingle ¶ 2 & Ex. A. The purpose of this policy is to purge the institution of weapons, drugs, and other contraband. *Id.* ¶ 2. Defendants assert that on September 23, 1992, Sistad's cell was randomly selected for a shakedown. *Id.* ¶ 3. As proof of this assertion, defendants submit the captain's report from September 23, 1992, which contains an entry for a "computer selected random shakedown" of Sistad's cell. *Id.* Ex. B.

Finally, defendants assert that the facts do not support plaintiffs' allegation that Scott was laid off in retaliation for his involvement in this lawsuit. Defendants assert that in the spring of 1992 two inmates who are not named plaintiffs in this action brought lawsuits in state court against nine private companies who are customers of Oak Park Heights Prison Industries. One of the companies named in the lawsuit was Argosy Electronics, Inc. (Argosy), which purchased hearing aid pouches from Oak Park Heights Prison Industries. Jan. 19, 1992 Affidavit of Guy Piras ¶ 2. On July 30, 1992, Argosy canceled its orders; the cancellation was confirmed in a letter from Argosy's attorney who stated that Argosy was "cancelling [sic] any further purchases of hearing aid pouches until the litigation regarding the sale of these items is resolved." *Id.* ¶ 3 & Ex. A. Because Oak Park Heights Prison Industries no longer had a customer to purchase its hearing aid pouches, it was forced to lay off inmates assigned to the Argosy production line. The inmates whose positions were made superfluous by the cancellation included Moten, Gatlin, and Scott, and those inmates were informed of the layoffs on the same day that Argosy canceled its orders. *Id.* ¶ 4–5. Shortly after informing the three inmates that they had been laid off, prison industry personnel determined that the lay-

offs should be accomplished in a more egalitarian manner, and therefore solicited volunteers to be laid off in place of Moten, Gatlin, and Scott. Three inmates volunteered, and Moten, Gatlin, and Scott returned to work the next morning. Moten, Gatlin, and Scott missed only one afternoon of work, and were paid for that afternoon. *Id.* ¶ 6.

Based upon this record, the Court finds that plaintiffs have failed to establish a genuine issue of material fact regarding their retaliation claim. Defendants' evidence establishes that defendants had legitimate reasons for the actions they took regarding Sistad and Scott. Plaintiffs have produced no evidence to rebut defendants' explanations for the challenged actions; instead, plaintiffs rely on conclusory allegations that the actions were motivated by defendants' desire to retaliate. However, "conclusive assertions of ultimate fact are entitled to little weight when determining whether a nonmovant has shown a genuine issue of fact sufficient to overcome a summary judgment motion." *Miller v. Solem,* 728 F.2d 1020, 1024 (8th Cir.), *cert. denied,* 469 U.S. 841, 105 S.Ct. 145, 83 L.Ed.2d 84 (1984). Moreover, in order to establish a claim for denial of access to the courts, plaintiffs must make some showing that they were in fact denied access to the courts or were otherwise prejudiced by defendants' actions. *McMaster v. Pung,* 984 F.2d 948, 953 (8th Cir.1993). Plaintiffs have failed to make such a showing. Therefore, the Court will grant summary judgment for defendants on Count 3 of the complaint.

Accordingly, based on the foregoing, and upon all the files, records and proceedings herein,

**IT IS ORDERED** that:

1. defendant's motion to dismiss Counts 1, 2, 4, 5, and 6 of the complaint is granted; and

2. defendants' motion for summary judgment on Count 3 of the complaint is granted.

**LET JUDGMENT BE ENTERED AC-CORDINGLY.**